UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                              Plaintiff,

               v.

ALBERT DONALD,

                              Defendant.

_____

REPORT & RECOMMENDATION

07-CR-6208L

## PRELIMINARY STATEMENT

By Order of Hon. David G. Larimer, United States District Judge, dated May 8, 2008, all pretrial matters in the above-captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 31).

Defendant Albert Donald ("Donald") is charged in a six-count indictment.  The first count charges Donald with conspiring, from June 2006 until August 22, 2006, to distribute and to possess with intent to distribute fifty grams or more of cocaine base, in violation of 21 U.S.C. § 846.  The second count of the indictment charges Donald with possessing with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B).  The third count of the indictment charges Donald with possessing more than five grams of cocaine base, in violation of 21 U.S.C. § 844(a).  The fourth count charges Donald with possessing firearms in furtherance of the drug trafficking crimes set forth in the first three counts, in violation of 18 U.S.C. § 924(c).  Counts Two through Four are alleged to have occurred on August 22, 2006.  The fifth and sixth counts contain forfeiture allegations pursuant

to 18 U.S.C. §§ 924(d) and 3665 and 28 U.S.C. § 2461(c); and 28 U.S.C. § 853(a)(1), respectively.  (Docket # 16).

Currently before this Court for Report and Recommendation are Donald's motions to dismiss the indictment and to suppress evidence seized by law enforcement on August 22, 2006, during the execution of a search warrant for 39 Poplar Street.[1]  Donald contends that the affidavit offered in support of the warrant was insufficient to establish probable cause.  Donald also moves to suppress evidence relating to a photographic identification and further moves to suppress statements and evidence seized following his arrest on August 22, 2006.  (Docket # 38).

This Court has reviewed a copy of the search warrant for 39 Poplar Street and the supporting affidavit and has conducted a *Franks* hearing based upon Donald's challenge to the truthfulness of certain allegations in the affidavit.  The Court also has conducted a *Wade* hearing relating to the out-of-court identification and an evidentiary hearing relating to Donald's post-arrest statements.

The following constitutes the Report and Recommendation of this Court with respect to each of the pending motions.

---

[1]   Donald's omnibus motion also sought, *inter alia*, an audibility hearing, a bill of particulars, discovery and inspection, *Brady* material, *Jencks* material, identification of informants and rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence.  (Docket # 38).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on August 14, 2008.  (Docket ## 43, 44).

## FACTUAL BACKGROUND

Hearings were held before this Court on September 4, 2008, and continued on October 17, 2008.[2]  The government called as witnesses Timothy A. Kernan, Special Agent with the Drug Enforcement Administration, Joseph A. Hopper, an officer with the Town of Greece Police Officer Department, and Gregory Jasper.  The defense did not call any witnesses.

## A.  Search Warrant for 39 Poplar Street

On August 18, 2006, Monroe County Court Judge John J. Connell issued a search warrant for 39 Poplar Street in Rochester, New York.  The search warrant was based upon the affidavit of Officer Joseph A. Hopper ("Hopper").  In his affidavit, Hopper described the factual basis for his opinion that probable cause existed to believe that the residence located at 39 Poplar Street would contain evidence relating to narcotics offenses.  (Hopper Aff. at 8).

Much of the information contained in Hopper's affidavit relates to a confidential informant ("CI").[3]  Hopper reported that the CI had begun working with the Greater Rochester Narcotics Enforcement Team ("GRANET") in May 2006 and had purchased narcotics for GRANET on at least nine occasions since that time.  *Id*.  According to Hopper, the CI had previously provided information concerning narcotics activity that had been corroborated by Hopper, and his undercover purchases had led to successful arrests and narcotics seizures.  (Hopper Aff. at 3).

---

[2]  The transcript for the hearing on September 4, 2008 will be referred to throughout as "Tr. A."  The transcript for the hearing on October 17, 2008 will be referred to as "Tr. B."

[3]  The government has identified the informant as Gregory Jasper.  (Docket # 41).  On the occasions described in the affidavit, Jasper was working under the supervision of GRANET officers because he had been arrested on federal drug charges and had entered into a cooperation agreement with the government in an attempt to secure a reduced sentence.  *Id*.

On June 27, 2006, the CI advised Hopper that he had had a conversation about narcotics with an individual whom he knew as "Mickey."  (Hopper Aff. at 4).  Specifically, the CI stated that he had approached Mickey, who was inside a purple Ford Expedition, and asked him whether he could supply the CI with a "31" (31 grams) of cocaine.  *Id*.  Mickey responded that he could, gave the CI his cellular telephone number and told the CI to call him when the CI was ready.  *Id*.

### 1.  <u>First Undercover Drug Purchase on June 28, 2006</u>

The next day, June 28, 2006, the CI telephoned Mickey at the number Mickey had provided him and told him that the CI needed to see him later that day to buy the "31."  *Id*. After meeting with GRANET officers, the CI again phoned Mickey and told him that the CI was now ready to meet.  *Id*.  Mickey advised the CI to meet him at the barber shop at the corner of Emerson Street and Dewey Avenue.  *Id*.  GRANET officers equipped the CI with a recording device, provided him with $850 and drove him to the area of the barber shop.  *Id*.  The officers observed the CI walk to the shop, where, a short time later, he was approached by a green Chevrolet Impala.  Mickey was inside the car.  The CI got into the back seat of the Impala, handed Mickey $850, in return for which Mickey gave him a baggie containing approximately 29 grams of crack cocaine.  *Id*.  After the purchase, the CI walked directly to the GRANET officers and gave them the baggie of crack cocaine.  *Id*.

### 2.  <u>Second Undercover Drug Purchase on July 14, 2006</u>

On July 14, 2006, Hopper and Agent Timothy A. Kernan ("Kernan") met with the CI to arrange another purchase of cocaine from Mickey.  (Hopper Aff. at 5).  The CI telephoned Mickey to ask if they could get together, and Mickey responded that the CI should meet him at Wegmans on Driving Park.  Hopper and Kernan equipped the CI with a recording device and

gave him $850.  As Hopper conducted surveillance, the CI proceeded in the direction of

Wegmans, but before he arrived, he saw Mickey driving south on Lake Avenue in a purple Ford

Expedition.  At that point, the CI telephoned Mickey, and Mickey told him to go instead to 120

Maryland Street, where Mickey's "workers" would take care of him.  *Id*.

Still under surveillance, the CI drove to 120 Maryland Street, where he observed

on the front porch two men whom he did not recognize.  He told the men to tell Mickey that he

was looking for him, and he left the location.  *Id*.  The CI then telephoned Mickey, and Mickey

advised him to return to 120 Maryland Street and to telephone him when the CI arrived.  *Id*.  The

CI returned to 120 Maryland Street and called Mickey, who directed him to put "AK" on the

phone.  *Id*.  One of the males then took the phone and spoke with Mickey.  *Id*.  After their

conversation, the CI told the man that he wanted to buy a quarter ounce of crack.  *Id*.  The man

gave the CI two baggies of crack cocaine, and the CI paid him $250.  *Id*.  The CI then met with

Hopper and Kernan and turned over the drugs.  *Id*.

### 3.  Third Undercover Drug Purchase on August 15, 2006

On August 15, 2006, Hopper and Sergeant John Henderson met with the CI in

order to arrange another purchase of cocaine from Mickey.  *Id*.  The CI telephoned Mickey, who

advised the CI to "come by Ambrose Street."  *Id*.  The officers gave the CI $850 and equipped

him with a recording device, after which the CI drove to the area of Ambrose Street.  Officers

who were conducting surveillance on Ambrose Street observed Mickey get into the CI's vehicle.

*Id*.  Mickey directed the CI to drive around the block.  As they did so, the CI told Mickey that he

wanted a "31," and Mickey responded that he might not have that much left.  *Id*.  After making a

telephone call, Mickey advised the CI that he only had five "8" balls left, but stated that he was

expecting to be "re-upped" in approximately an hour.  *Id*.  They returned to Ambrose Street and

parked behind a green Chevrolet Impala, which a woman exited.  The woman, later identified as Felicia Womack ("Womack"), walked to the CI's car and handed Mickey a baggie containing five chunks of crack cocaine.  *Id*.  The CI handed Mickey $450, and Mickey exited the CI's vehicle.  *Id*.  The CI then met with Hopper and Henderson and provided them the cocaine and remaining cash.  (Hopper Aff. at 7.)

Later that day, the CI telephoned Mickey to inquire whether Mickey had been "re-upped."  *Id*.  Mickey stated that he had been and directed the CI to meet him at a Sunoco gas station at the corner of Gregory Street and Mt. Hope Avenue.  *Id*.  After obtaining $450 in undercover funds, the CI drove to the Sunoco station.  *Id*.  Meanwhile, Kernan was conducting surveillance at 39 Poplar Street and observed Womack leave the residence in a green Chevrolet Impala.  *Id*.  The Impala drove directly to the Sunoco station, where Hopper observed Womack exit the vehicle and enter the passenger side of the CI's car.  *Id*.  Womack gave the CI five chunks of crack cocaine, for which the CI paid her $450.  *Id*.  The CI then telephoned Mickey to complain that the price was too high.  *Id*.  After his meeting with Womack, the CI met with Hopper and turned over the recently-purchased cocaine.  *Id*.

### 4.  **Other Information Contained in Hopper's Affidavit**

On June 30, 2006, Hopper and Kernan met with the CI and presented him with an array containing six photographs.  (Hopper Aff. at 4.)  The CI identified a photograph of Albert Donald as the person whom he knew as Mickey.  *Id*.

On July 21, 2006, Hopper learned from Donald's probation officer that Donald lived at 39 Poplar Street.  (Hopper Aff. at 5).

**B.  Testimony of Officer Joseph A. Hopper**

Hopper testified that in preparing his affidavit he relied upon information provided to him by Gregory Jasper ("Jasper"), the individual he identified therein as the "CI," regarding the three controlled purchases of cocaine reported in the affidavit.  (Tr. B 62-63). Hopper conducted surveillance of two of the purchases and observed Jasper meet with Donald, although he did not see either of the alleged exchanges between them.  (Tr. B 64).  At no time did Jasper advise Hopper that any of the information he had provided him was untrue.  (Tr. B 63).

**C.  Testimony of Gregory Jasper**

Jasper testified that in April 2006 he was charged with violating the terms of his supervised release by selling cocaine.  (Tr. B 6-7).  Believing that he was facing fifteen to twenty years in prison on the charges and hoping for leniency in sentencing, Jasper agreed to cooperate with the government.  (Tr. B 7, 34).

As a result, in May 2006, Jasper began working with Hopper and Officer Tim Henderson to purchase narcotics.  (Tr. B 9).  At the time, Jasper suspected that an individual named "Mickey," whom he knew from the neighborhood, was involved in selling cocaine, although Jasper had never personally engaged in narcotics transactions with him.  (Tr. B 11). Jasper did not consider Mickey a friend, but knew him well enough to say hello on the street. (Tr. B 13).  Jasper suggested to Hopper and Henderson that he could probably buy a half-ounce or "31" from Mickey.  *Id*.

Jasper testified that on three subsequent occasions he made controlled purchases of cocaine from Mickey.  (Tr. B 14).  Following each purchase, he signed a statement describing

the transaction.  (Tr. B 15-20; G. Exs. 3, 4, 5).  (Each of these statements substantially tracks the

information contained in Hopper's affidavit).  Jasper further testified that all of the information

contained in each of the statements was true and accurate and that he signed them voluntarily.

(Tr. B 20-21).  At no time did Jasper advise the officers that the information he had provided

them was not truthful.  (Tr. B 59).

Two years later, in January 2008, Jasper was incarcerated in connection with a

subsequent supervised release violation.  (Tr. B 23).  On January 23, 2008, Jasper was

transported to a correctional facility in Youngstown, Ohio.  *Id*.  Within approximately two days

of his arrival, Jasper encountered Mickey in the facility cafeteria.  (Tr. B 24, 26).  According to

Jasper, his brother had informed him that Mickey knew that Jasper had cooperated against him;

as a result, Jasper was afraid that Mickey would "jump" him.  (Tr. B 26).  Because he felt

threatened and wanted to defuse any potential trouble, Jasper approached Mickey and offered to

write a letter on his behalf.  (Tr. B 27, 29).  Jasper then prepared and gave Mickey a signed

letter, stating:

> To whom it may concern[.]  My name is Gregory Fitzgerald
> Jasper.  I was a federal inmate that was force[d] to co[o]perate
> against Mickey.  I will come to court on his defense or you can
> come see me in Youngstown Ohio.  Let me know what I have to
> do to cle[a]r [h]is name.

(G. Ex. 6).

Approximately two days later, Mickey came to Jasper's "pod" with a typed

statement that he wanted Jasper to sign and have notarized.  (Tr. B 30; G. Ex. 7).  Jasper testified

that he was concerned by Mickey's presence in his pod because pods were restricted areas that

were not supposed to be accessible to inmates who were housed in different units, as Donald

was.  (Tr. B 30, 39-40).  Jasper signed the statement on January 28, 2008, but did not have it

notarized.  (Tr. B 32).  The document states:

> To whom it may concern, my name is Gregory Jasper.  I was a
> federal inmate that was forced to cooperate against Albert
> Donald[] [i]n the matter of Albert Donald of Rochester, N.Y.  I
> Gregory Jasper, being duly sworn, deposes, and says, that on the
> dates of June 27, 2006, June 28, July 14, and August 15, 2006, I
> Gregory Jasper wasn't being truthful of purchasing said amount of
> drugs from Albert Donald "Mickey".  I was in a situation where I
> was in fear from prosecution for my crimes, which occurred prior
> [to] the matter.  I am a felon and am serving time for my own
> actions.  But, at the time however the Agent in Charge would tell
> me what to do and say when it was untrue.  I don't want to put an
> innocent man's life in jeopardy.  In my statement during the
> investigation I wasn't being fully truthful on the matter of Albert
> Donald.  I would do anything in my power if I can to change the
> occurred events that I have said in the statements I've signed with
> the agents.  Therefore, in this situation I was not forced,
> threatened, coerced, or any kinds of promises [*sic*] to make or sign
> this statement to the courts.  I've read it, and signed it truely [*sic*]
> and correctly to the best of my ability, belief, and knowledge.

(G. Ex. 7).  Jasper testified that the statement was untrue.  (Tr. B 31).


**D.  Testimony of Agent Timothy A. Kernan**

Kernan testified that on August 22, 2006, he arrested Albert Donald at the Sunoco

service station on the corner of Gregory Street and Mt. Hope Avenue.  (Tr. A 10-11).  After

handcuffing Donald, Kernan placed him inside his vehicle and explained to Donald that he was

facing federal charges relating to his sale of over 50 grams of cocaine.  (Tr. A 11).  Kernan then

advised Donald of his *Miranda* rights by reading verbatim from a DEA card.  (Tr. A 12-13;

G. Ex. 1).  Kernan asked Donald whether he would be willing to answer some questions, and

Donald indicated that he was willing to talk with Kernan and wanted to help his situation.  (Tr. A

13-14).

9

Kernan then transported him to an interview room at the Rochester office of the DEA.  (Tr. A 15).  At no point during the car ride did Kernan question Donald or did Donald request an attorney.  *Id*.  After arriving at the DEA office, Kernan took Donald to an interview room, where he again advised Donald of his *Miranda* rights.  (Tr. A 16, 27).  Using an advice of rights form, Kernan read each right aloud to Donald and then asked Donald to place his initials next to each right if he understood the right.  Donald initialed each right.  Kernan then asked Donald to read the "waiver" portion of the form and to sign it if he understood it and agreed to waive his rights.  (Tr. A 16; G. Ex. 2).  Donald signed the form.  (Tr. A 17; G. Ex. 2).  At no time did Donald ask Kernan any questions about his rights.  (Tr. A 17-18).

Kernan credibly testified that he did not make any promises to Donald in exchange for Donald's agreement to answer questions other than his representation that he would advise the prosecutor of Donald's desire to cooperate.  (Tr. A 20).  During the interview, Donald appeared sober, appeared to understand Kernan's questions and responded appropriately. (Tr. A 23).  Donald did not request an attorney during his interview, nor did he request to speak to anyone else or make any telephone calls.  (Tr. A 24, 32).  The interview lasted approximately two hours.  (Tr. A 23).

## DISCUSSION

### I.  Motions to Dismiss Indictment

Donald moves to dismiss the indictment based upon allegedly improper grand jury instructions and a speculative belief that a number of grand jurors who voted to return the indictment may not have been present during the entire presentation of evidence before the grand jury.  (Docket # 38).  This Court recommends that these motions be denied.

10

With respect to Donald's challenge to the instructions given to the grand jury, "there is no requirement that federal grand jurors be instructed on the law." *United States v. Hernandez*, 2001 WL 1344832, *17 (W.D.N.Y. 2001) (citing *United States v. Zangger*, 848 F.2d 923, 925 (8th Cir. 1988); *United States v. Kenny*, 645 F.2d 1323, 1347 (9th Cir.), *cert. denied*, 452 U.S. 920 (1981)).  Moreover, Donald's motion is based upon nothing more than the speculative assertion that the grand jury minutes will reveal some deficiency in the instructions. Hope and speculation are wholly insufficient to overcome the rule of secrecy in grand jury proceedings that is embodied in Fed. R. Crim. P. 6(e).  *See, e.g.*, *United States v. Jailall*, 2000 WL 1368055, *2 (S.D.N.Y. 2000) (the rule of secrecy, which can only be overcome by a showing by the defendant that grounds exist to dismiss the indictment based upon matters that occurred in the grand jury, applies to legal instructions provided to the grand jury); *United States v. Olin Corp.*, 465 F. Supp. 1120, 1134-35 (W.D.N.Y. 1979) (mere conjecture that some irregularities occurred in the grand jury does not support an inquiry into the proceeding that led to the indictment).

With respect to his second motion, an indictment need not be dismissed where some of the jurors who voted to return the indictment were not present to receive all the evidence, as long as a quorum of grand jurors was present at all proceedings.  *United States ex rel. McCann v. Thompson*, 144 F.2d 604, 607 (2d Cir.), *cert. denied*, 323 U.S. 790 (1944).  *See also United States v. Byron*, 994 F.2d 747, 748 (10th Cir. 1993); *United States v. Overmyer*, 899 F.2d 457, 465 (6th Cir.), *cert. denied*, 498 U.S. 939 (1990); *United States v. Godoy*, 678 F.2d 84, 86 (9th Cir. 1982), *cert. denied*, 464 U.S. 959 (1983).  Donald has adduced no evidence to suggest that the required quorum was not present.

11

Accordingly, I recommend denial of Donald's motions to dismiss the indictment on the basis of speculative claims of improper instructions and voting irregularities.

## II.  Motion to Suppress Photographic Identification

Donald also seeks to suppress evidence relating to a photographic identification of him by Jasper.  (Docket # 38).  An out-of-court photographic identification will be suppressed under the due process clause if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

In determining whether to exclude a pretrial identification, the court must undertake a two-step analysis.  First, the court must consider whether the identification procedure was unduly suggestive.  If so, the court then must determine whether the identification nevertheless possesses "sufficient aspects of reliability."  *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.) (citing *Manson v. Brathwaite*, 432 U.S. 98, 109-17 (1977)), *cert. denied*, 434 U.S. 872 (1977).  "Even if the procedure was unnecessarily (or impermissibly) suggestive, therefore, a district court may still admit the evidence 'if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.'"  *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (footnote omitted) (quoting *United States v. Simmons*, 923 F.2d 934, 950 (2d Cir.), *cert. denied*, 500 U.S. 919 (1991)), *cert. denied*, 513 U.S. 862 (1994).

At Donald's request, this Court conducted a *Wade* hearing.[4]  (Docket # 43).  At the hearing, however, no testimony was offered regarding the June 30, 2006 identification procedure.  Although both officers present during the procedure (Hopper and Kernan) testified during the motion hearings, neither was questioned regarding the procedure.  In the absence of testimony relating to the procedure itself, this Court cannot find that the procedure was not suggestive.  *See*, *e.g.*, *United States v. Thai*, 29 F.3d 785, 808 (2d Cir.) (in evaluating the suggestiveness of a photographic procedure, court must consider "the manner of presentation by the officers," including "the utterance of suggestive comments before an identification is made"), *cert. denied*, 513 U.S. 977 (1994).

Even if it were suggestive, however, I find that Jasper's testimony establishes that his identification of Donald was independently reliable.  Specifically, he testified that prior to his undercover work, he knew Donald from the neighborhood and was well-enough acquainted with him to say hello.  More importantly, within days of the photographic procedure, Jasper had two face-to-face meetings with Donald.  In the first, which occurred three days before the procedure, Jasper met with Donald and discussed purchasing cocaine.  In the second, which occurred two days before the procedure, Jasper met again with Donald and this time bought $850 worth of cocaine from him.

On this record, I find that Jasper's out-of-court identification of Donald was sufficiently reliable to defeat Donald's due process challenge.  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 973 (2d Cir. 1990) ("[t]he linchpin for admissibility of

---

[4]  A *Wade* hearing refers to a hearing held pursuant to *United States v. Wade*, 388 U.S. 218 (1967), to determine whether an out-of-court identification resulted from an impermissibly suggestive procedure and, if so, whether it is independently reliable.

identification testimony is reliability"), *cert. denied*, 501 U.S. 1233 (1991).  I thus recommend that Donald's motion to suppress the photographic identification be denied.


III.   **Motion to Suppress Tangible Evidence**

Donald moves to suppress evidence seized from his residence at 39 Poplar Street during the execution of a search warrant issued by Monroe County Court Judge John Connell. According to Donald, the affidavit offered in support of the warrant failed to establish probable cause because it contained information that was knowingly or recklessly false.  Specifically, Donald argues that (1) Jasper supplied false information to Hopper and (2) Hopper was aware that the information was false and deliberately included it in his search warrant affidavit. (Docket # 38).  Donald's contention is premised upon the two statements that he obtained from Jasper when they were both incarcerated in the Youngstown, Ohio facility.  (G. Exs. 6, 7).  On this record, the government and this Court agreed that a *Franks* hearing was warranted.  (Docket # 41).

Donald also moves for suppression based on the alternative argument that the affidavit failed to establish probable cause because it contained no allegation that drug activity was being conducted at 39 Poplar Street itself.  (Docket # 38-2 at 4).  This Court will consider each of these arguments in turn.

A.  **Franks Hearing**

Under the Supreme Court's holding in *Franks v. Delaware*, "a district court may not admit evidence seized pursuant to a warrant if the warrant was based on materially false and misleading information."  *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)), *cert. denied*, 507 U.S. 954 (1993).  To warrant a

*Franks* hearing, a defendant challenging an affidavit must make "a substantial preliminary showing that (1) the affidavit contained false statements made knowingly or intentionally, or with reckless disregard for the truth; and (2) the challenged statements or omissions were necessary to the Magistrate's probable cause finding."  *Id.* (citing *Franks v. Delaware*, 438 U.S. at 171-72) (internal quotation omitted).  A hearing is required if the defendant provides the court with a sufficient basis upon which to doubt the truth of the affidavit at issue.  As the Supreme Court has explained:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient.

*Franks*, 438 U.S. at 171.

In this case, Jasper testified that he purchased crack cocaine from Donald on three occasions and that he signed statements after each purchase accurately describing the transaction.  At no time did Jasper advise the officers that any of the information contained in his statements was false.  Hopper explained that he relied on Jasper's information when preparing his affidavit and credibly testified that he had no reason to doubt the veracity of the information.  His confidence in its accuracy was reasonable considering the informant's track record of reliability, as well as the fact that the officers recorded and visually monitored each of the three controlled purchases.

At the hearing, Jasper unequivocally testified that the two statements he signed for Donald in 2008 were not true and that he signed them because he felt threatened by Donald's presence in the same facility in which he was incarcerated.  Jasper reaffirmed that the original statements he had provided the investigating officers were true and that they accurately reflected the circumstances of the purchases he had made from Donald.

Donald argues that Jasper's testimony is inherently unreliable and should be discredited because of his extensive criminal record and history of drug and alcohol use. (Docket # 53).  Assessing Jasper's credibility is a determination that the trial jury likely will undertake.  On this motion, however, I need not delve too deeply into that issue, although I note that much of the information contained in Hopper's affidavit was corroborated by surveillance and investigation conducted by the officers.  Rather, the issue before me is whether Donald has demonstrated that Hopper relied on false information that he knew or should have known to be false.  Nothing in the record suggests that Hopper doubted the accuracy of Jasper's information or that he was reckless in crediting it.  Accordingly, I recommend denial of Donald's *Franks* motion.

## B.  **Probable Cause**

Alternatively, Donald alleges that Hopper's affidavit did not establish probable cause for the warrant's issuance because the affidavit included no evidence that the alleged drug deals occurred at 39 Poplar Street.  In addition, Donald argues that the affidavit provided an inadequate basis upon which to conclude that Jasper was a reliable informant.  (Docket # 53 at 4).

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the

16

place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41. In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement. According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Illinois v. Gates*, 462 U.S. at 238-39) (internal quotation omitted). Moreover, "resolution of marginal cases should be determined by the preference to be afforded to warrants." *Id.* (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

Here, I conclude that Hopper's affidavit established probable cause to believe that evidence relating to narcotics offenses would be discovered at 39 Poplar Street. First, Donald's probation officer identified that address as Donald's residence. That fact alone, coupled with the information about Donald's involvement in three sales of hundreds of dollars worth of cocaine, is sufficient cause to justify a search for drug records. *See, e.g.*, *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("major drug traffickers frequently maintain at their homes large amounts of cash, drugs, books, ledgers and other documents evidencing their criminal activities"); *United States v. Serna*, 625 F. Supp. 548, 563 (S.D.N.Y. 1985) (finding that probable cause existed for search warrant for defendant's home based on allegations of defendant's "street behavior" and his undisputed residence at the address). Second, and most

importantly, law enforcement officers had observed Donald's companion exit 39 Poplar Street

shortly after Donald confirmed to Jasper that his supply had been "re-upped" and drive directly

to the Sunoco gas station, where she provided cocaine to Jasper in exchange for $450.  This sale

occurred only three days before the warrant's issuance.  When considered with the other

allegations in the warrant, that evidence established probable cause to believe that evidence of

narcotics offenses would be found at 39 Poplar Street.

　　　　Finally, I reject Donald's contention that the affidavit lacked probable cause

because it did not adequately demonstrate Jasper's reliability.  To the contrary, the affidavit

disclosed that Jasper had made nine previous controlled purchases of narcotics and had provided

information about drug activity that had been corroborated by Hopper.  According to Hopper,

Jasper's cooperation had led to seizures of narcotics and arrests of individuals involved in drug

dealing.  In addition, Jasper's transactions with Donald were recorded and surveillance was

conducted of their meetings.  These allegations sufficiently demonstrate probable cause for the

warrant's issuance.  *See United States v. Harris*, 403 U.S. 573, 580 (1971) (information from an

informant, coupled with the "affiant's own knowledge of the respondent's background, afforded

a basis upon which a magistrate could reasonably issue a warrant").

　　　　Furthermore, Donald has failed to offer any evidence to suggest that the searching

officers did not rely upon the warrant in good faith.  *See United States v. Leon*, 468 U.S. 897

(1984).  No credible evidence exists that Judge Connell was knowingly misled or that he wholly

abandoned his judicial role.  *See id.* at 923.  Nor was the warrant so facially deficient or so

lacking in probable cause that reliance upon it would have been unreasonable.  *See id.*; *United

States v. v. Cancelmo*, 64 F.3d 804, 807 (2d Cir. 1995) (citations omitted).  Accordingly, it is my

18

recommendation that Donald's motion to suppress evidence seized from 39 Poplar Street be
denied.

## IV. <u>Motion to Suppress Statements</u>

Statements made during custodial interrogation are generally inadmissible unless
a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436
(1966). In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's
statements that are the product of custodial interrogation unless it demonstrates that the
defendant was first warned of his Fifth Amendment privilege against self-incrimination and then
voluntarily waived that right. *Miranda v. Arizona*, 384 U.S. at 444.

> Custodial interrogation exists when a law enforcement official
> questions an individual and that questioning was (1) conducted in
> custodial settings that have inherently coercive pressures that tend
> to undermine the individual's will to resist and to compel him to
> speak (the in custody requirement) and (2) when the inquiry is
> conducted by officers who are aware of the potentially
> incriminating nature of the disclosures sought (the investigative
> intent requirement).

*United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (citing *United States v. Morales*,
834 F.2d 35, 38 (2d Cir. 1987) (internal citations omitted)).

In the case at bar, the government does not contest that Donald was subject to
custodial interrogation. The question, therefore, is whether Donald was advised of his rights and
lawfully waived them before speaking with Kernan. To establish a valid waiver, the government
must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's
rights was voluntary, and (2) that the defendant had a full awareness of the right being waived

and of the consequences of waiving that right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

In this case, I find that Kernan properly advised Donald of his *Miranda* rights by reading them verbatim from a rights form. He did so twice, once in the car on the way to the DEA office and a second time after they arrived at the office. Before doing so the first time, Kernan explained to Donald why Donald was in custody and indicated that he wanted to discuss the matter with him. Donald indicated that he was willing to talk. Rather than commence the interview then, Kernan waited until they were in the interview room and had administered *Miranda* warnings to Donald a second time. This time he asked Donald to initial and sign the form to indicate that he understood his rights and wanted to waive them; Donald did so. At no time did Donald request an attorney or indicate that he wanted to stop the interview. Moreover, nothing in the record indicates that Donald was intoxicated, injured or ill. Donald was not threatened, nor were any improper promises made to him, in order to induce him to speak.

On this record, I find that Donald's waiver of his constitutional rights was knowing and voluntary. I therefore recommend denial of Donald's motion to suppress statements on the grounds that they were obtained in violation of his Fifth Amendment rights.

## CONCLUSION

For the foregoing reasons, it is my recommendation that Donald's motion to dismiss the indictment **(Docket # 38)** be **DENIED**. It is my further recommendation that

Donald's motions to suppress the out-of-court identification, tangible evidence and statements

**(Docket # 38)** be **DENIED**.


_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
February   4   , 2009

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[5]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

   *s/Marian W. Payson*         
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      February   4  , 2009

---

[5]Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).